# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 20-0005V

| | |
|---|---|
| LOREN G. HATHCOCK, *as Personal Representative of* the Estate of BEVERLY HATHCOCK, | Chief Special Master Corcoran |
| Petitioner, | Filed: January 14, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Mark Kim Hellie, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On January 3, 2020, Beverly Hathcock filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Ms. Hathcock alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine that was administered on September 13, 2018. Petition at 1.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). On September 2, 2022, Loren Hathcock (on behalf of Ms. Hathcock's estate) moved to amend the case caption after Ms. Hathcock passed away from a condition unrelated to her vaccination. ECF Nos. 46-47.

Respondent conceded the case, but the parties could not reconcile their valuations of Ms. Hathcock's past pain and suffering, past lost wages, and unreimbursable medical expenses. ECF Nos. 30, 34-45, 48-50. They submitted briefing on the subject in late 2023, along with expert reports primarily addressing the dispute regarding the duration of Ms. Hathcock's injury. *See* ECF Nos. 51-58, 60-68. The matter is now ripe for adjudication.

**For the following reasons, I find that Petitioner is entitled to compensation in the form of a lump sum payment of $142,297.75 (representing $140,000.00 for past pain and suffering, $1,385.65 for past lost wages, and $912.10 for past unreimbursable expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.**

## I.    Relevant Factual Evidence

Respondent does not dispute that Ms. Hathcock received care related to her SIRVA through August 1, 2019 – or for approximately 11 months following her September 13, 2018 vaccination. *See,* e.g., Opp. at 14-15. Her relevant treatment included seeking care within 36 days of vaccination, at which time she exhibited acromioclavicular ("AC") joint tenderness, tenderness of the deltoid, triceps, and biceps, and limited internal rotation behind her back – leading her treater to assess her with tendonitis and a suspected frozen shoulder (Ex. 4 at 20-22).

While being treated for her SIRVA, Ms. Hathcock received prescription medications (dexamethasone, tramadol, Norco). Ex. 3 at 6-8; Ex. 4 at 19, 22. Her pain was rated at a 9/10 two months post vaccination (described as constant, aching, and stabbing with stiffness) (Ex. 5 at 17-18), and she displayed varying degrees of diminished range of motion ("ROM") (and impingement signs) causing restrictions with activities of daily living ("ADLs"), such as reaching overhead and doing her hair. *See,* e.g., Ex. 2 at 35, 66; Ex. 3 at 6. A November 2018 MRI revealed mild glenohumeral osteoarthritis ("OA") with posterior labral degeneration and fraying and a subtle complex tear of the posterosuperior labrum, mild supraspinatus tendinopathy, and small glenohumeral joint effusion but no partial or full-thickness rotator cuff tear. Ex. 4 at 51-52. She had two steroid injections – the first providing three months of relief (Ex. 2 at 66; Ex. 5 at 17), plus 26 total physical therapy ("PT") sessions (12 pre-operative and 14 post-operative) plus a home exercise program ("HEP") (Ex. 2 at 1-39; Ex. 8 at 1-31). Finally, she underwent one

arthroscopic bursectomy shoulder surgery in June 2019 (consisting of intraarticular and extraarticular debridement including chondroplasty, labrum debridement, and debridement of extensive subacromial bursitis) to treat her diagnosis of adhesive capsulitis, left shoulder rotator cuff tendinitis/bursitis, and possible SIRVA (Ex. 2 at 66; Ex. 6 at 4-6).

Ms. Hathcock's post-operative diagnoses listed on June 7, 2019, included "left shoulder rotator cuff tendinitis/bursitis possible SIRVA," early OA, and a degenerative labral tear. Ex. 6 at 4. At the time of Ms. Hathcock's last PT visit two months later, on August 1, 2019, Ms. Hathcock reported increased active and passive ROM but that she "still ha[d] some mild difficulty [] with [active] ROM [of the left] shoulder [with] [internal rotation]." Ex. 8 at 30. The physical therapist provided Ms. Hathcock with exercises and stretches "to help increase ROM in the shoulder." *Id.* Ms. Hathcock was discharged to an HEP. *Id.*

The same day as her discharge from PT, on August 1, 2019, Ms. Hathcock also had a post-operative follow up with her orthopedic surgeon. Ex. 7 at 25. Ms. Hathcock reported that she was "much improved" with "[s]ome slight occasional twinges" and "slight residual stiffness" in the shoulder. *Id.* She admitted she was "essentially pain free" and she was "[e]xtremely pleased with her improvements." *Id.* Ms. Hathcock's left shoulder physical examination revealed abduction of 80 degrees with an external rotation of 40 degrees. *Id.* at 27. The orthopedist recommended Ms. Hathcock "return to regular activity and regular work duties as [her] symptoms tolerate" and to return if her symptoms worsened. *Id.* at 28.

There is then a dispute between the parties regarding whether Ms. Hathcock's later treatment (beginning in February 2020) was attributable to her SIRVA, or whether an intervening fall that occurred on January 15, 2020, was the cause of her renewed left shoulder symptoms, requiring additional but unrelated treatment. *See,* e.g., Brief at 14-22; Opp. at 15-19.

Thus, nearly seven months after her August 1, 2019 discharge from PT, on February 25, 2020, Ms. Hathcock returned to her internist and reported that "[o]ver the last week [she] had worsening pain as well as decreased ROM in [her] left shoulder." Ex. 12 at 1, 3. The physician noted that Ms. Hathcock experienced "reasonably good results" following her June 2019 surgery. *Id.* at 3. A physical examination showed limited ROM in abduction and extension and tenderness to the subacromial bursa. *Id.* The physician noted that Ms. Hathcock had "tenderness over [the] subacromial bursa." *Id.* To the physician, this suggested bursitis, but he also thought Ms. Hathcock "could have frozen shoulder as well as tendinitis given [her] other symptoms." *Id.*

Ms. Hathcock returned to her original orthopedic surgeon on March 9, 2020, "with new complaints of pain to the left shoulder." Ex. 11 at 2. The orthopedic surgeon noted that Ms. Hathcock had a history of arthroscopy for "possible SIRVA" and that "[p]ostoperatively [she] did quite well." *Id.* He also noted that Ms. Hathcock had been "relatively asymptomatic until January" with "worsening pain over the last few months." *Id.* She described her pain as aching and intermittently sharp and worse with reaching, lifting, and overhead activity. *Id.* Ms. Hathcock did not report a "specific injury or trauma that started it[;]" however, she did wonder if it was related to a dermatological procedure. *Id.* She then also reported that she "had a fall in mid[-]January with some pain around the back and shoulder blades bilaterally." *Id.* The orthopedist noted that Ms. Hathcock specifically complained of "some pain around the spine and rhomboid region bilaterally related to her fall" and she felt the symptoms had persisted. *Id.* at 6. A physical examination of the left shoulder showed tenderness, positive impingement signs, and limited external rotation. *Id.* at 4. Ms. Hathcock received a steroid injection in the left shoulder. *Id.* at 5. The assessment included left shoulder tendonitis. *Id.* at 6.

On April 3, 2020, Ms. Hathcock saw a physician at a spine institute for back pain present for "2-6 months." Ex. 13 at 146. She complained of constant, severe, aching, burning, and stabbing in her mid-thoracic and lower lumbar spine, plus pins and needles sensation in the same area. *Id.* Ms. Hathcock reported that her symptoms began "after falling," specifically that they "started after she slipped in a grocery store striking her mid thoracic back and landing on her buttocks." *Id.* Ms. Hathcock was assessed with lumbar spondylosis, spinal stenosis of the lumbar region, myofascial pain, and thoracic back pain. *Id.* at 150.

Later that month, on April 23, 2020, Ms. Hathcock returned to her orthopedic surgeon for a follow-up. Ex. 14 at 1. Ms. Hathcock endorsed "some brief improvement" following her steroid injection. *Id.* She complained of persistent pain, worse with reaching and lifting (especially behind her back), and stiffness. *Id.* at 3. The orthopedic surgeon reviewed Ms. Hathcock's recent MRI findings and felt that it showed mild tendinosis of the supraspinatus and infraspinatus tendons with fraying of the articular surface fibers – but *no* evidence of a high-grade partial or full-thickness tear of the rotator cuff. *Id.* at 5 (emphasis added). The orthopedic surgeon noted that the MRI also revealed mild OA "as seen on the prior study," degeneration/tearing of the superior, anterior, and posterior labrum, "which appear[ed] to [have] progressed compared to the prior study," and trace glenohumeral joint effusion with synovitis. *Id.* According to the treater, Ms. Hathcock's underlying arthritis could "certainly contribute to pain and stiffness, albeit [her arthritis was] not severe." *Id.* The assessment included left shoulder pain and "arthritis of the shoulder region joint." *Id.*

The same day, Ms. Hathcock began another round of PT for "low back and left shoulder pain" plus "myalgia, unspecified site." Ex. 13 at 1. Ms. Hathcock reported the date of onset as "1/15/2020" due to "trauma." *Id.* Specifically, she complained of "low back and upper back pain[,]" which she noted "began after going to [the] grocery store where she slipped and fell flat on her back." *Id.* She noted "worsening pain ever since." *Id.* She also noted her history of left shoulder surgery in June 2019 "due to a poor reaction to a flu shot ("SIRVA")." *Id.* The physician wrote that Ms. Hathcock "continue[d] to be limited with reaching behind her back." *Id.* Her "primary symptoms" were described as "[l]ower back pain described as sharp and upper back feels like 'someone pounded on her back' with lots of sore spots." *Id.* Ms. Hathcock also endorsed left wrist pain and stated that her history of left rotator cuff surgery was "complicating her pain and functional capacity." *Id.* at 4. Ms. Hathcock attended an additional three PT sessions through May 4, 2020. *Id.* at 6-13.

Ms. Hathcock saw another orthopedic surgeon for a second opinion on April 27, 2020, complaining of left shoulder pain. Ex. 16 at 32-33. She stated that the pain "started in 2018 when she received a flu shot." *Id.* at 33. Ms. Hathcock described the pain as deep and achy, sharp with stiffness and weakness, and rated at a 10/10. *Id.* She noted that she did not have a "good resolution" following her prior treatment. *Id.* The orthopedic surgeon reviewed her MRI results and opined that it was "officially read as tendinosis although there appears to be a partial cuff tear of the subscapularis." *Id.* Ms. Hathcock underwent an x-ray that showed minor OA of the glenohumeral joint with a "small inferior goat's beard osteophyte," a type I acromion, and degenerative changes at the rotator cuff insertion site. *Id.* at 35. The assessment included pain of the left shoulder joint, rotator cuff syndrome, partial thickness rotator cuff tear, and OA of the left shoulder joint. *Id.* at 34.

She underwent a left arthroscopic subscapularis repair and supraspinatus repair in a single row fashion, arthroscopic soft tissue biceps tenodesis, an extensive arthroscopic glenohumeral debridement, and arthroscopic subacromial decompression on May 19, 2020. Ex. 17 at 6-8. Both the pre- and post-operative diagnoses were listed as left shoulder pain, partial rotator cuff tear of the left shoulder, a degenerative labral tear, and impingement syndrome. *Id.* at 6. Ms. Hathcock began post-operative PT on June 1, 2020. Ex. 13 at 15-18.

On June 15, 2020, Ms. Hathcock saw an orthopedic hand surgeon complaining of left "hand pain, wrist pain" specifically left wrist pain, and bilateral thumb pain. Ex. 16 at 25-26. She stated that the pain began on "1/15/2020 after she slipped and fell at [a grocery store]." *Id.* at 27. Ms. Hathcock explained that she landed on "both hands." *Id.* She also stated that ever since her May 2020 shoulder surgery, "she has been having left thumb pain and feels that the thumb was 'jammed' in the sling when she couldn't feel it

postoperatively." *Id.* The assessment included left wrist sprain and "bilateral thumb MP joint [OA]." *Id.* at 28.

During a July 6, 2020 post-operative follow-up for her shoulder with her orthopedic surgeon, Ms. Hathcock's physician noted that her shoulder "recovery [ha]s been complicated by wrist pain and finger dysfunction." Ex. 16 at 25. The assessment included a partial thickness rotator cuff tear. *Id.* There is also a note to keep Ms. Hathcock out of work for another six weeks "given her hand dysfunction." *Id.*

On July 21, 2020, Ms. Hathcock returned to the orthopedic hand surgeon with a primary complaint of left hand and wrist pain. Ex. 16 at 20. Her wrist pain had gotten worse, and she had "developed significant swelling and stiffness throughout the hand[;]" the tips of her fingers were also purple. *Id.* A physical examination did not reveal left shoulder abnormalities. *Id.* at 21. She had x-rays and MRIs of the hands and wrists – showing thumb joint OA and mild flexor tenosynovitis in the left wrist. *Id.* at 22. Ms. Hathcock received a carpal tunnel steroid injection into the left wrist. *Id.* She was assessed with a sprain of the left wrist, complex regional pain syndrome ("CRPS") (type I vs. type II), arthritis of the hand, and carpal tunnel syndrome of the left wrist. *Id.* at 22-23.

Ms. Hathcock had a post-operative orthopedic visit for her left shoulder on August 21, 2020. Ex. 16 at 15. The orthopedic surgeon noted that Ms. Hathcock's recovery course was "complicated by CRPS of her hand as well as some stiffness of the left shoulder." *Id.* The assessment included adhesive capsulitis of the left shoulder, CRPS of the upper limb, partial thickness rotator cuff tear, and rotator cuff syndrome. *Id.* at 18-19. Despite Ms. Hathcock's shoulder stiffness, the orthopedic surgeon did not want to do "anything aggressive in terms of surgery as [h]e d[id] not want to aggravate her CRPS." *Id.* at 18.

From September 1, 2020, to February 3, 2022, Ms. Hathcock continued to receive treatment with the hand surgeon for her *bilateral* hand/wrist symptoms, diagnosed as carpal tunnel syndrome and CRPS. Ex. 16 at 12-15; Ex. 19 at 1-4, 9-20; Ex. 21 at 6-9, 12-14. During her November 3, 2020 visit, she noted that "she [could not] type due to pain in [her left] hand" and she was trying to apply for long term disability. Ex. 19 at 4. She did not feel she could perform her job duties and she explained that "there [wa]s no light duty where she work[ed]." *Id.*

On October 2, 2020, Ms. Hathcock returned to her orthopedic surgeon for her left shoulder reporting "tightness particularly in internal rotation" but stating that her "pain is going down." Ex. 13 at 255-56. A physical examination of the left shoulder showed

diminished ROM. *Id.* at 257. The orthopedic surgeon's assessment included a partial thickness rotator cuff tear and adhesive capsulitis of the left shoulder – which required continued stretching to recover her ROM. *Id.* at 258. If that was unsuccessful, a third surgical procedure was proposed. *Id.*

Ms. Hathcock attended 41 PT sessions (45 total since April 23, 2020), through November 23, 2020. Ex. 13 at 1-144. The purpose of this treatment was listed as "pain in left shoulder" and "pain in joints of left hand." *See,* e.g., *id.* at 142. During her November 23, 2020 session, the physical therapist noted that Ms. Hathcock's shoulder was "feeling better." *Id.* The "treatment diagnosis" stated that Ms. Hathcock "present[ed] with left hand and shoulder pain, stiffness in wrist and shoulder, and weakness in [left upper extremity] secondary to frozen shoulder symptoms and signs/symptoms related to CRPS." *Id.* at 143. The physical therapist described Ms. Hathcock's symptomology stating:

> [she] has decreased motion of digits of [left] hand, increased hand pain, and slight digit swelling, which are consistent with symptoms associated with CRPS. She is unable to type due to decreased dexterity of the hand and pain in her hand. She has severely decreased ROM of the shoulder and has increased shoulder pain. Her shoulder symptoms are consistent with adhesive capsulitis.

*See id.*

On January 25, 2021, Ms. Hathcock returned to her orthopedic surgeon for a follow-up regarding her left shoulder. Ex. 19 at 17. The orthopedist reiterated that Ms. Hathcock's post-operative course was "complicated by . . . CRPS that affected her *entire extremity*." *Id.* at 18 (emphasis added). She exhibited reduced external rotation on examination. *Id.* at 19. She received a steroid injection in the left shoulder and received a new referral to PT for her adhesive capsulitis, partial thickness rotator cuff tear, and CRPS. *Id.* at 19-20.

Ms. Hathcock started another round of PT on January 28, 2021, for "pain and stiffness and weakness in left shoulder." Ex. 20 at 236. The physical therapist documented Ms. Hathcock's history consistent with that above (attributing her left shoulder pain to the subject flu vaccine), adding that following her June 2019 surgery, she "started to have worsening pain in December/January 2020." *Id.* Additionally, an "MRI revealed a new rotator cuff tear requiring second surgery in May 2020" after which she experienced a "difficult recovery with development of CRPS in left arm with weakness, pain, and skin color changes." *Id.* Ms. Hathcock rated her left shoulder pain at a 0/10 but

a 10/10 at worst. *Id.* She endorsed difficulties reaching behind her back and overhead but also noted she was "unable to use [her] *right* hand for typing." *Id.* (emphasis added).

On April 19, 2021, Ms. Hathcock saw her orthopedic surgeon and received a repeat steroid injection. Ex. 21 at 33-34. The orthopedic surgeon noted that Ms. Hathcock had not "hit" her "endpoint goals yet" and that "extensive" PT was required to "continue recovering her internal rotation." *Id.* at 34. Ms. Hathcock subsequently attended 55 additional PT sessions for left shoulder stiffness and CRPS through August 25, 2021 – when her insurance would no longer cover additional visits. *See* Ex. 20 at 3. By August 2021, "[a]ll functional goals ha[d] been reached to their satisfaction," although she still exhibited a functional limitation with "reaching behind her back and up to her scapulae." *Id.* Ms. Hathcock passed away on April 30, 2022, due to factors unrelated to her vaccine injury. *See* Ex. 23.

Petitioner described the left shoulder pain his wife, Ms. Hathcock, experienced following her flu vaccination as "horrendous and relentless." Ex. 23 ¶ 4. According to Petitioner, Ms. Hathcock did not experience improvement following her treatment with PT and two surgeries. *Id.* ¶¶ 4-5. Because of her functional limitations, Petitioner had to assist her with dressing, bathing, lifting anything above shoulder level (i.e. putting dishes away), cooking, and fastening her seatbelt. *Id.* ¶ 6. She also could no longer shop, garden, or craft as a result of her injury. *Id.* ¶ 7. Additionally, Petitioner emphasized that Ms. Hathcock suffered from her left shoulder pain up until the day she died. *Id.* ¶ 9. In her own affidavit, authored on January 21, 2020, Ms. Hathcock noted that she was "out of work for two months on [short-term disability] pay from [her] left arm rotator cuff surgery" in 2019. Ex. 9 ¶ 8.

## II.    The Parties' Arguments

Petitioner seeks a pain and suffering award of $210,000.00, $4,376.43[3] in lost wages, and $4,420.471 in unreimbursable medical expenses. Brief at 12. Upon arguing for this sum, he recounts Ms. Hathcock's shoulder pain and weakness she experienced for over three-and-half years post vaccination and up until the time of her untimely death in 2022. *Id.* at 14-15. Petitioner also relies on Ms. Hathcock's aggressive treatment, including two surgeries resulting in little improvement (and a recommended third surgery), a severe pain rating at a 9-10/10 throughout her treatment course, receipt of five steroid injections, and attendance at 126 total physical therapy ("PT") sessions – which were discontinued due to insurance limits, not a resolution of pain. *Id.* at 15-18. And Petitioner

---

[3] Petitioner asks for $3,717.40 in lost wages in at least one place in his opening brief. Brief at 26. However, this appears to be a typographical error, as he subsequently (and consistently) asks for $4,376.43 throughout the brief and reply. *See id.* at 12, 14, 27; *see also* Reply at 1, 14.

relies on the limitations in Ms. Hathcock's ADLs, including with bathing, dressing, sleeping, cooking, lifting, fastening her seatbelt, housework, yardwork, gardening, and shopping. *See id.*

In support of Petitioner's claim for past lost wages, Petitioner states that Ms. Hathcock was a clinical administrative coordinator with an insurance company, but her SIRVA prevented her from performing her job. Brief at 26. Petitioner asserts that Ms. Hathcock "obtained disability benefits from May 19, 2020, through October 19, 2020," and she was wholly unable to work for "two months and one week in the 2020 fiscal year." *Id.* According to Petitioner, Ms. Hathcock was ultimately terminated from her position on March 29, 2021, due to her extended absences. *Id.* Petitioner additionally argues that he should be compensated for the entirety of Ms. Hathcock's unreimbursed medical expenses for the more than three-year duration of her injury. *Id.*

For comparable cases, Petitioner offers *Schoonover* and *Lawson*[4] - decisions featuring past pain and suffering awards ranging from $200,000.00 to $205,000.00. Brief at 23-24. Petitioner also supplementally[5] relies on other multiple surgery SIRVA cases (*McAuliffe, Welch, McDorman, Elmakky, M.W.,* and *Lang*)[6] wherein approximately $200,000.00 was properly awarded for pain and suffering. *Id.* at 24-25. Petitioner requests that Ms. Hathcock be awarded "at the highest end of this range, at $210,000 . . . if not slightly more." *Id.* at 25.

In proffering a lower award of $80,000.00 for pain and suffering, $1,385.65 in lost wages, and $912.10 in unreimbursable medical expenses, Respondent emphasizes that Ms. Hathcock's injury was relatively moderate, resolving within one year with treatment including one MRI, two steroid injections, three prescription medications, 26 PT sessions,

---

[4] Citing *Schoonover v. Sec'y of Health & Hum. Servs.*, No. 16-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 for past pain and suffering); *Lawson v. Sec'y of Health & Hum. Servs.*, No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000.00 for past pain and suffering).

[5] While Petitioner delves into the comparable details between Ms. Hathcock's case and the petitioners in *Schoonover* and *Lawson*, he does not do the same for the remaining cases he relies on for support. He merely cites to the cases and lists the amount of compensation awarded. *See* Brief at 23-25.

[6] Citing *McAuliffe v. Sec'y of Health & Hum. Servs.,* No. 18-1507V, 2020 WL 5079506 (Fed. Cl. Spec. Mstr. July 28, 2020) (awarding $200,000.00 for past pain and suffering); *Welch v. Sec'y of Health & Hum. Servs.,* No. 18-74V, 2021 WL 1795205 (Fed. Cl. Spec. Mstr. Apr. 5, 2021) (awarding $210,000.00); *McDorman v. Sec'y of Health & Hum. Servs.,* No. 19-814V, 2021 WL 5504698 (Fed. Cl. Spec. Mstr. Oct. 18, 2021) (awarding $200,000.00); *Elmakky v. Sec'y of Health & Hum. Servs.,* No. 17-2032V, 2021 WL 6285619 (Fed. Cl. Spec. Mstr. Dec. 3, 2021) (awarding $205,000.00); *M.W. v. Sec'y of Health & Hum. Servs.,* No. 18-267V, 2021 WL 3618177 (Fed. Cl. Spec. Mstr. Mar. 17, 2021) (awarding $195,000.00); *Lang v. Sec'y of Health & Hum. Servs.,* No. 17-995V, 2022 WL 3681275 (Fed. Cl. Spec. Mstr. July 25, 2022) (awarding $195,000.00).

and one surgery. Opp. at 14, 19. Respondent contends that Ms. Hathcock recovered from her original SIRVA in August 2019, relying on her reported improvement two months after her first surgery, and only mild noted difficulties at the time of her discharge from her first round of PT. *Id.* at 14. He asserts that Ms. Hathcock was then pain free until January 2020, but thereafter suffered a fall that caused multiple ailments and a resurgence of shoulder pain. *Id.* at 14-17. Respondent separates Ms. Hathcock's 2020 symptoms and argues that her 2020 MRI showed new injuries, including pre-existing degenerative pathology unrelated to her SIRVA. *Id.* at 19. Respondent opposes an award for pain and suffering, lost wages, and/or unreimbursable medical expenses after August 2019 and offers *Hunt* and *Shelton*[7] as more appropriate comparable cases. *Id.* at 20-24.

Petitioner replies that Respondent has failed to establish that Ms. Hathcock suffered a superseding shoulder injury unrelated to her underlying SIRVA – and thus care she received after August 2019 should be taken into account herein as SIRVA-associated. Reply at 14-15.

## III.    Expert Qualifications and Opinions

Both parties offered expert reports to substantiate their pain and suffering positions.

### A.  Dr. Srikumaran

Petitioner's expert, Dr. Uma Srikumaran, is board certified in orthopedic surgery. Ex. 25 at 1. He currently serves as an Associate Professor in the Shoulder Division and as the Shoulder Fellowship Director at Johns Hopkins; he is also the Medical Director of the Johns Hopkins Ambulatory Surgical Center in Howard County, Maryland. *Id.* He previously served as the Chair of Orthopaedic Surgery for the Howard County General Hospital. *Id.* Dr. Srikumaran treats thousands of shoulder issues and performs hundreds of shoulder surgeries, annually. *Id.* He has treated roughly 10-12 SIRVA cases and has also published in the area. *Id.*

Dr. Srikumaran accurately homes in on the issue in dispute: whether Ms. Hathcock's January 2020 fall contributed to her need for ongoing care and subsequent second left shoulder surgery. Ex. 25 at 19. He opines that Ms. Hathcock's fall "had little contribution to [her] worsening of shoulder symptoms following her initial surgery." *Id.* He asserts that Ms. Hathcock instead experienced ongoing capsular tightness/stiffness

---

[7] *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering); *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021) (awarding $95,000.00).

following her initial June 2019 surgery – supported by her report of slight residual stiffness at her two-month surgical follow up appointment. *Id.* (citing Ex. 7 at 28).

In addition to the ongoing capsular tightness, Dr. Srikumaran asserts that Ms. Hathcock also had ongoing bursitis and impingement affecting the subacromial bursa following her initial surgery. Ex. 25 at 19. He relies on Ms. Hathcock's April 27, 2020 visit during which she exhibited limited ROM and positive impingement signs in support of this argument. *Id.* (citing Ex. 16 at 34). Dr. Srikumaran also relies on Ms. Hathcock's temporary relief "from a subacromial cortisone injection"[8] to argue that the cause of her pain originated from the subacromial bursa; and that her subacromial bursa was thickened and inflamed post second surgery despite a bursectomy one year earlier. *Id.* at 19-20 (citing Ex. 17 at 7).

In attempting to distinguish the impact of Ms. Hathcock's January 15, 2020 fall, Dr. Srikumaran proposes that its mechanism was "not consistent with a shoulder injury," since Ms. Hathcock slipped and fell "'striking her mid[-]thoracic back and landing on her buttocks.'" Ex. 25 at 19 (citing Ex. 13 at 138). Without citing to other specific medical records, Dr. Srikumaran contends that "[i]n combination with other accounts of the fall, it seems as though [Ms. Hathcock] braced herself with both of her arms . . . [which] would be unlikely to aggravate [her] shoulder symptoms." *Id.* Dr. Srikumaran highlights that Ms. Hathcock consistently attributed other specific orthopedic complaints (pain in the "upper, middle[,] and lower spine along with her left wrist,") to the fall, "but [not] increased shoulder pain following the fall." *Id.* Thus, his "interpretation of the events" is that Ms. Hathcock began having increased shoulder pain before the fall, "which is why she cannot attribute a specific injury or trauma to the recurrence of [shoulder] pain." *Id.*

Additionally, he contends that Ms. Hathcock's fall did not cause her rotator cuff tear seen on her second surgery. Ex. 25 at 20. Rather, he opines that, "given the size and location," the tear seen was "likely a degenerative[-]type tear that occurs over time and with aging." *Id.* He contends that Ms. Hathcock's "symptoms following the fall [were] inconsistent with an acute tear" because she did not experience a "sudden change" in pain and function – instead suffering a "more indolent and insidious" recurrence of pain. *Id.* Even without the fall, Dr. Srikumaran believes Ms. Hathcock "would have required additional surgery given the intraoperative findings during her second surgery." *Id.*

Ms. Hathcock's second orthopedic surgeon, Dr. James Andry, authored a short opinion letter in support of the contested issues in this case. Ex. 26. Dr. Andry is licensed in orthopedic surgery, with a specialty in complex shoulder reconstruction and arthroscopy. *Id.* at 1-2. Dr. Andry began treating Ms. Hathcock in 2020 and performed her

---

[8] Dr. Srikumaran does not specify to which of Ms. Hathcock's cortisone injections he is referring.

second left shoulder surgery in May of 2020. *Id.* at 1. Despite not having treated Ms. Hathcock until 2020, Dr. Andry opines that Ms. Hathcock's entire clinical course was related to her September 13, 2018 flu vaccine. *Id.* at 2. He argues that Ms. Hathcock had a "complicated postoperative course due to [CRPS] after her second surgery." *Id.* To him, this suggests that "there was more likely than not a nerve injury due to SIRVA that was aggravated by the regional anesthesia and surgery, which is also consistent with SIRVA." *Id.* He did not elaborate further on this point.

### B. Dr. Bishop

Respondent's expert, Dr. Julie Bishop, is board certified in orthopedic surgery and specializes in shoulder surgery and sports medicine. Ex. A at 1. She is currently a professor in the Department of Orthopaedic Surgery at the Ohio State University, Wexner Medical Center, and Chief of the Division of Shoulder Surgery, Administrative Vice Chair, and Vice Chair of Finance for the Orthopaedic Department. *Id.* She has treated "many patients with SIRVA" and primarily studies shoulder pathology. *Id.* at 1-2. She has also published in the area of SIRVA. *Id.* at 2.

Dr. Bishop describes "2 very clear episodes" of care: one in the time interval between September 13, 2018 and August 1, 2019, and the second running from February 25, 2020 to August 2021. Ex. A at 11. Dr. Bishop relies on Ms. Hathcock's noted improvement and discharge from PT in August 2019 as a "clear indicator" that she had recovered by that time. *Id.* at 13. Dr. Bishop states that there is nothing in the medical records to show that she "sustained any ongoing pain after those final visits in August of 2019." *Id.* Dr. Bishop argues that "when a medical issue is ongoing, physician care and [PT] is not stopped." *Id.*

She notes that Ms. Hathcock's second episode of care (beginning in February 2020) "focused on multiple medical conditions which encompasse[d] left wrist pain/left wrist sprain/right and left thumb pain/upper and lower back pain/bilateral shoulder blade pain/myofascial pain/left shoulder pain/left hand CRPS/left upper extremity CRPS." Ex. A at 11-12. Dr. Bishop argues that Ms. Hathcock's flu vaccination "had no bearing on these conditions." *Id.* at 12. Rather, Ms. Hathcock's medical records "indicate that all of these diagnoses relate back to the fall [on] January 15th, 2020, [and] are interrelated[.]" *Id.* According to Dr. Bishop, "it is not medically sound to think that 10 of the above diagnoses are related to the fall . . . but just one, left shoulder pain, is not related[.]" *Id.*

Indeed, Dr. Bishop opines that Ms. Hathcock's January 15, 2020 fall was the cause of her ongoing left shoulder symptomology and second episode of care. Ex. A at 13-14. Dr. Bishop acknowledges that Ms. Hathcock's first post-fall medical visit (on February 25,

2020), does not contain descriptions of the onset of her left shoulder pain attributable to the fall. *Id.* at 13. However, Dr. Bishop emphasizes that the visit notes also state her pain had "been going on for less than a month" and the fall was a month earlier. *Id.* Dr. Bishop discounts Ms. Hathcock's reports to treaters in 2020 (that her pain began when she received a flu shot in 2018 and that she did not have good resolution following surgery) and argues such assertions are not supported by the contemporaneous medical records that document a "complete resolution of her symptoms related to her SIRVA [] for nearly 6 months until her fall." *Id.*

As added support, Dr. Bishop relies on Ms. Hathcock's March 9, 2020 orthopedic visit wherein she related her back/shoulder blade/rhomboid region pain to her January 2020 fall. Ex. A at 13. Dr. Bishop notes that Ms. Hathcock also described onset of her left shoulder pain as occurring in January 2020, but she did not relate such pain to the same fall. *Id.* To Dr. Bishop, this speaks to "some recall difficulty." *Id.* According to Dr. Bishop, "the same recall difficulty is not allowing her to link her new onset shoulder pain to the fall." *Id.* Additional evidence of Ms. Hathcock's recall difficulty is found in her reported three different mechanisms of how she fell to three different providers: that she fell on her buttocks, flat on her back, and landed on both hands. *Id.*

Dr. Bishop compares the findings on Ms. Hathcock's MRIs. She emphasizes that Ms. Hathcock's first MRI (in November 2018)[9] is consistent with her later June 2019 post-operative findings of "early [OA] and [a] degenerative labral tear" without evidence of a rotator cuff tear. Ex. A at 12. Dr. Bishop argues these conditions were pre-existing and not related either to her vaccination or the symptoms she experienced thereafter. *Id.* at 12-13. In fact, according to Dr. Bishop, Ms. Hathcock's "new MRI [in 2020] showed progression of the same prior degenerative findings" with her second orthopedic surgeon opining that there was also evidence of a partial cuff tear of the superior subscapularis – "never present in 2019." *Id.* at 14. Dr. Bishop contends that the rotator cuff tears repaired during Ms. Hathcock's second surgery in 2020 were "new findings and hence cannot be correlated to the [flu] vaccination she received in 2018." *Id.* at 14-15.

Additionally, Dr. Bishop notes that Ms. Hathcock developed adhesive capsulitis following her second surgery in 2020, but she asserts that this 2020 post-operative adhesive capsulitis diagnosis "was in no way related to the adhesive capsulitis she developed *and recovered from* after her vaccination." Ex. A at 14-15 (emphasis in original). According to Dr. Bishop, shoulder stiffness after a rotator cuff tear repair is a

---

[9] Dr. Bishop appears to erroneously assert that Ms. Hathcock underwent an MRI in November 2019 – however, Ms. Hathcock underwent a left shoulder MRI in November 2018. *Compare* Ex. A at 12, *with* Ex. 4 at 51-52.

"common complication,"[10] and it is therefore "not surprising or uncommon for this to happen to" Ms. Hathcock. *Id.* at 14. Dr. Bishop maintains that the "mild residual stiffness" noted following Ms. Hathcock's 2019 surgery had "no correlation to the stiffness she developed after her second surgery." *Id.* at 15. Still, it was "clearly not related to the vaccination in 2018." *Id.* at 14.

## IV.   Authority

In several recent decisions, I have discussed at length the legal standard to be considered in determining the appropriate amount of damages for SIRVA claims, based in part on their treatment in SPU. I fully adopt and hereby incorporate my prior discussion from Sections III and IV of *Leslie v. Sec'y Health & Hum. Servs.*, No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) and *Johnson v. Sec'y of Health & Hum. Servs.,* No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021), as well as Sections II and III of *Tjaden v. Sec'y of Health & Hum. Servs.,* No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021). *See also Yodowitz v. Sec'y of Health & Hum. Servs.,* No. 21-370V, 2024 WL 4284926 (Fed. Cl. Spec. Mstr. Aug. 23, 2024) (discussing statistical data of compensation awarded in prior SIRVA cases to-date).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[11]

## V.   Appropriate Compensation for Ms. Hathcock's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Ms. Hathcock was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Ms. Hathcock's injury.

---

[10] Although Dr. Bishop cites to medical literature references, it does not appear that such literature was filed for the record. I thus am unable to consider such evidence in determining the appropriate weight to afford to Respondent's expert report.

[11] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

When performing the analysis in this case, I review the record as a whole to include the medical records, affidavits, expert reports, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

As previously stated, the main dispute in this case centers around the *duration* of Ms. Hathcock's vaccine-related shoulder injury – and, in turn, what treatments (or surgical procedures) can reasonably be attributed to the SIRVA. Petitioner argues her SIRVA course ran for three-and-a-half years post vaccination (up until her death in April 2022), while Respondent contends it resolved within one year (by August 2019). The medical record preponderantly supports Respondent's position: that Ms. Hathcock's treatment course for vaccine-related left shoulder pain and ongoing SIRVA symptoms continued for approximately 11 months (or through August 2019), with her subsequent treatment not preponderantly associated with the SIRVA.

Several aspects of the overall record support this determination. For example, the filed medical evidence shows that Ms. Hathcock's later treatment (beginning in February 2020 and thereafter) was not SIRVA-related. Rather, Ms. Hathcock experienced a clear intervening accident that explains her subsequent treatment. Moreover, when Ms. Hathcock returned to care following the near seven-month gap (on February 25, 2020), she did not link her shoulder pain to the subject flu vaccine. Ex. 12 at 1, 3. Instead, and beginning at her second post-gap visit (on March 9, 2020), Ms. Hathcock specifically attributed her shoulder pain to either a dermatological procedure or the fall she experienced in a grocery store in January 2020. Ex. 11 at 2.

Ms. Hathcock thereafter *consistently* related her resurgence of shoulder pain (plus back pain and other ailments) to her accident, and not the subject vaccination. *See,* e.g., Ex. 13 at 146 (an April 3, 2020 report); Ex. 13 at 1 (an April 23, 2020 report). I acknowledge that Ms. Hathcock *did* relate her later left shoulder symptoms to the 2018 flu vaccine on at least one occasion. But this complaint came after she had already attributed such pain to the January 2020 fall and, *most importantly*, well after she initiated the instant claim (also in January 2020). *See,* e.g., Ex. 16 at 33 (an April 27, 2020 note reporting left shoulder pain that "started in 2018 when she received a flu shot."). This one stray vaccination association does not preponderate against the weight of the other evidence.

Relatedly, I am not persuaded by Dr. Srikumaran's attempts to explain away Ms. Hathcock's January 2020 fall as unrelated to her ongoing shoulder symptomology. It is in fact impossible to glean the exact nature of her fall from the filed medical record, which

includes multiple inconsistent reports of how Ms. Hathcock landed following the fall. *See* Ex. 13 at 146 (stating she fell striking her "mid[-]thoracic back and landing on her buttocks."); Ex. 13 at 1 (stating she "slipped and fell flat on her back.");  Ex. 16 at 25-27 (stating she "slipped and fell at [a grocery store]" and landed on both hands). And it remains the case that Ms. Hathcock's resurgence of left shoulder pain began *following* her January 2020 fall – which occurred far closer-in-time to this block of treatment than the vaccination event in 2018. It is therefore fair to take this sequence into account. *See Bidlack v. Sec'y of Health & Hum. Servs.,* No. 20-93V, 2023 WL 2885332, at *6, n.5 (Fed. Cl. Spec. Mstr. Apr. 11, 2023) (noting it is "certainly [] conceivable that a Program claimant could suffer an intervening accident post-vaccination that did better explain subsequent symptoms than the alleged SIRVA – or that played a role in exacerbating symptoms that would bear on the quantum of damages to be awarded").

There is also the fact that Ms. Hathcock experienced recovery following her first surgery in June 2019, leading to her discharge from formal treatment on August 1, 2019, and subsequent near seven-month gap in *any* shoulder-related complaints (or treatment). For instance, during Ms. Hathcock's August 1, 2019 PT and orthopedic visits, she endorsed increased active and passive ROM (despite some lingering ROM restrictions), as well as stating that she was "much improved" and "essentially pain free." Ex. 8 at 30; Ex. 7 at 25-28. She also stated that she was "[e]xtremely pleased with her improvements." Ex. 7 at 25. Her orthopedic surgeon instructed her to return to regular activity and work duties and only to return if her lingering symptoms worsened. *Id.* at 28. It is persuasive that Ms. Hathcock did not return to care for nearly seven months following this date. All of the above undermines Petitioner's argument that Ms. Hathcock's SIRVA symptoms continued past August 2019.

Indeed, although Ms. Hathcock appears to have experienced lingering or residual "stiffness" and/or "twinges" after her discharge from care (Ex. 7 at 25-27), even her *post-gap* medical records also support that she experienced a period of near-complete recovery following her June 2019 surgery – despite her later contentions to the contrary. *See,* e.g., Ex. 12 at 3 (a February 25, 2020 note stating Ms. Hathcock experienced "reasonably good results" following her June 2019 surgery); Ex. 11 at 2 (a March 9, 2020 note stating "[p]ostoperatively [Ms. Hathcock] did quite well[;]" she had been "relatively asymptomatic until January[;]" and she then presented for "new complaints" of left shoulder pain); *see also* Ex. 16 at 33 (an April 27, 2020 note to the contrary stating she did not have a "good resolution" following her surgery). Such entries help establish that Ms. Hathcock's SIRVA had largely resolved by August 2019.

More so, and consistent with the vast majority of Program SIRVA claims, there exists evidence of other pre-existing and degenerative changes that independently could have (and likely did) become an issue for Ms. Hathcock, separate from her original SIRVA. *See,* e.g., *Handley v. Sec'y of Health & Hum. Servs.,* No. 21-1194V, 2024 WL

1328709 (Fed. Cl. Spec. Mstr. Feb. 21, 2024) (dismissing a Table claim due to the petitioner's severe, end-stage degenerative joint disease and primary glenohumeral OA of both shoulders that could better explain her injury than the subject vaccine).

Thus, Ms. Hathcock's original November 2018 MRI revealed mild glenohumeral OA with posterior labral degeneration and fraying and a subtle complex tear of the posterosuperior labrum, mild supraspinatus tendinopathy, small glenohumeral joint effusion, and no partial or full-thickness rotator cuff tear. Ex. 4 at 51-52. By the time she underwent a repeat MRI in April 2020, it was read to show (in relevant part) mild OA "as seen on the prior study," and degeneration/tearing of the superior, anterior, and posterior labrum that had "progressed compared to the prior study." Ex. 14 at 5. These entries thus support Respondent's expert's argument that Ms. Hathcock's post-gap symptoms and repeat MRI showed a progression of the same prior degenerative findings that likely would have persisted independently from the subject vaccine injury. In fact, Petitioner's own expert (Dr. Srikumaran) agrees that the tear seen in Ms. Hathcock's second surgery was a "degenerative[-]type tear that occurs over time and with aging." Ex. 25 at 20. Additionally, Ms. Hathcock's second surgery in May 2020 required repair of a partial rotator cuff tear not seen during her first surgical procedure in June 2019. *Compare,* Ex. 17 at 6, *with* Ex. 6 at 4. It thus is more likely than not that Ms. Hathcock's September 2018 flu vaccination did not play a part in her ongoing and progressing symptomology requiring continuing care in 2020 and thereafter.

The medical record (starting with her February 2020 care) otherwise clearly establishes that Ms. Hathcock experienced other comorbid but distinctive hand/thumb/wrist and back issues (eventually diagnosed as CRPS and/or carpal tunnel syndrome) that were clearly unrelated to and inconsistent with her original SIRVA – providing another basis for distinguishing her 2020 treatment from her SIRVA. Petitioner never attributed such symptoms to the subject flu vaccination or her SIRVA, and she received entirely separate care and diagnoses for her other *bilateral* upper extremity complaints, including CRPS. *See,* e.g., Ex. 16 at 28 (a June 15, 2020 assessment of left wrist sprain, bilateral thumb joint OA); Ex. 16 at 22-23 (July 21, 2020 MRIs of the hands and wrists, showing thumb joint OA and left wrist flexor tenosynovitis requiring a carpal tunnel injection in left wrist; assessed with CRPS, carpal tunnel syndrome of left wrist); *see also* Ex. 16 at 12-15; Ex. 19 at 1-4, 9-20; Ex. 21 at 6-9, 2-14.

The filed record in this case indeed establishes that Ms. Hathcock suffered a moderate-to-severe SIRVA overall. Particularly probative is evidence demonstrating that Ms. Hathcock sought treatment for left shoulder pain within 36 days of her vaccination, underwent subsequent treatment with several prescription medications, one MRI, two corticosteroid injections (with the first providing three months of relief), participation in pre- and post- operative rounds of PT for a total of 26 sessions (plus an HEP), and one arthroscopic surgery – resulting in some lingering stiffness and effects. Additionally, Ms.

Hathcock's medical records contain at least one description of her pain on a ten-point scale (9/10) – thus supporting a severe injury. *See* Ex. 5 at 17-18 (rating her pain at a 9/10 two months post vaccination). She also experienced diminished ROM soon after vaccination, with some slight lingering limitations at the conclusion of her vaccine-injury related care in August 2019. Ex. 2 at 35, 66; Ex. 3 at 6; Ex. 7 at 25-27.

Turning to the parties' cited comparable cases, Petitioner's reliance on *Schoonover* and *Lawson* is misplaced. Ms. Hathcock's vaccine-related care did not likely include her second surgery, but these cases involved petitioners that (in relevant part) underwent *two and three* surgeries, respectively. *Schoonover*, 2020 WL 5351341; *Lawson,* 2021 WL 688560. Additionally, *Schoonover* experienced a noted 40% permanent disability following the conclusion of care - whereas here there is *no* evidence to suggest that Ms. Hathcock's treaters thought her left shoulder injury was permanent (despite some ongoing effects). *See* 2020 WL 5351341. Likewise, the *Lawson* petitioner treated for over four years – nearly four times the duration of Ms. Hathcock's vaccine-related shoulder treatment. *See* 2021 WL 688560. *Lawson*, like *Schoonover*, experienced noted disabilities following treatment. *See id.* Other petitioners in the cases cited by Petitioner likewise underwent at least one additional surgery than that seen here in Ms. Hathcock's case, therefore entitling Petitioner to a lesser award than that awarded to those petitioners. *Welch,* 2021 WL 1795205; *Elmakky,* 2021 WL 6285619 *M.W.,* 2021 WL 3618177; *Lang,* 2022 WL 3681275. Petitioner's cited comparable cases thus do not advance his argument with respect to a proper award for pain and suffering and a significantly lesser award is therefore appropriate here.

Respondent's offered comparable cases of *Hunt* and *Shelton* are, however, also largely unhelpful in calculating pain and suffering. As has previously been noted, these two decisions stand as "outlier determinations, and rare instances of deviating from the above $100,000.00 'norm' for SIRVA cases involving surgery." *Laurette v. Sec'y of Health & Hum. Servs.*, No. 19-1047V, 2024 WL 1741611, at *5 (Fed. Cl. Spec. Mstr. Mar. 25, 2024); *see also,* e.g., *Olson v. Sec'y of Health & Hum. Servs.*, No. 21-0408V, 2024 WL 1521634, at *4 (Fed. Cl. Spec. Mstr. Mar. 4, 2024) (characterizing the cases as "outliers in the context of SIRVA damages"); *Gao v. Sec'y of Health & Hum. Servs.*, No. 21-1884V, 2023 WL 6182455, at *3 (Fed. Cl. Spec. Mstr. Aug. 18, 2023) (emphasizing that *Hunt* and *Shelton* were "*sui generis* instances of a sub-six figure award in SIRVA cases featuring surgery"). It is instead the case that "the policy goals of the Vaccine Program are best served if outcomes in common cases (like SIRVA vaccine injury claims) are predictable and/or subject to some uniformity – and it has been my determination that surgery cases reasonably present a degree of suffering justifying a six-figure award. (Otherwise, adjustments are always considered and made to account for the facts of each case, and in some instances even SIRVA surgery cases result in lower pain and suffering awards)."

*Richardson v. Sec'y of Health & Hum. Servs.*, No. 20-0674V, 2023 WL 6180813, at *8 (Fed. Cl. Spec. Mstr. Aug. 16, 2023).

Ms. Hathcock's SIRVA was not so exceptionally moderate to warrant a departure below the six-figure norm for injuries leading to surgery (and certainly not even lower such that it might fit Respondent's proposal of $80,000.00). In fact, the characteristics of Ms. Hathcock's injury most factually mirror those in *Mates v. Sec'y of Health & Hum. Servs.*, No. 20-1662V, 2024 WL 3425745 (Fed. Cl. Spec. Mstr. June 11, 2024) (awarding $135,000.00 in past pain and suffering). That petitioner suffered a relatively mild SIRVA for approximately 19 months, and received fairly equivalent care to Ms. Hathcock, including one arthroscopic surgery, two cortisone injections, and a "modest" amount of pre- and post-operative PT, totaling 20 sessions. *Id.* at 5. Most factually analogous to Ms. Hathcock's case is that both pre- and post-vaccination, the *Mates* petitioner reported symptoms (neck pain and digit numbness) that had a cervical element, while simultaneously complaining of shoulder symptoms. *Id.* And following a reported post-operative improvement in shoulder symptoms similar to Ms. Hathcock, the *Mates* petitioner had a significant (13-month) gap in shoulder-related care. *Id.* But when the *Mates* petitioner returned to care (after the initiation of his Program claim), his treaters felt that many of his complaints were likely related to his comorbid cervical spine pathology. *Id.* Based on such complaints, I determined that there was "not sufficient evidence to connect [*Mates*'] later [shoulder] symptoms and second surgery . . . to the SIRVA he suffered three years earlier[.]" *Id.* The same is true of Ms. Hathcock's circumstances.

Based on all of the circumstances and evidence submitted, I find that Ms. Hathcock's past pain and suffering warrants a slightly higher award than that in *Mates* and will accordingly award **$140,000.00.**

## VI.    Appropriate Compensation for Lost Wages and Unreimbursed Expenses

The Vaccine Act provides compensation for lost wages as follows:

> In the case of any person who has sustained a vaccine-related injury after attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded, compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections.

42 U.S.C. § 300aa-15(a)(3)(A).

Accordingly, a prerequisite for a lost earnings award is a finding of impairment to

earning capacity as a result of the vaccine-related injury, and compensation is limited to petitioner's "actual and anticipated loss of earnings." As the special master in *Brown v. Sec'y of Health & Hum. Servs.,* recognized, "the Vaccine Act requires that lost earnings be calculated in a cautious manner . . . ." No. 01-60V, 2005 WL 2659072, at *6-8 (Fed. Cl. Spec. Mstr. Sept. 21, 2005). As with other elements of damages, petitioner bears the burden of supporting his claim for lost earnings with preponderant evidence. 42 U.S.C. § 300aa-11(e); *see,* e.g., *Wilkerson v. Sec'y of Health & Hum. Servs.*, No. 90-822V, 1998 WL 106132, at *2 (Fed. Cl. Spec. Mstr. Feb. 24, 1998) ("petitioner [], as in any claim brought before this forum, has the obligation to prove her case, and that proof includes a preponderance of evidence on the issue of reasonable damages.").

Section 15(g) provides an offset to a Program award to the extent payment has been made, or can reasonably expected to be made "under any State compensation program, under an insurance policy, or under any Federal, or State health benefits program," with the exception of Medicaid benefits 42 U.S.C. § 300aa-15(g). Section 15(g) "was designed to avoid overcompensation in certain circumstances where payments are made from other programs." *Heinzelman v. Sec'y of Health & Hum. Servs.,* 681 F.3d 1374, 1382 (Fed. Cir. 2012). However, payments from programs such as social security disability payments ("SSDI"), for example, are not included in such an offset because they are not enumerated as, and cannot be considered, state or federal health benefits under Section 15(g), nor are they part of the lost earnings calculation under Section 15 (a)(3)(A). *See id.* at *1379-82.

The parties disagree regarding the proper amount to be awarded for Ms. Hathcock's past lost wages (with Petitioner requesting $4,376.43 and Respondent contending that $1,385.65 is appropriate). Respondent specifically "objects to the remainder of lost wages sought, which consists of reimbursement for lost wages from 2019 without the proper offsets applied as well as lost wages from 2020 and thereafter that are unrelated to [Ms. Hathcock's] vaccine injury," as her injury resolved by August 2019. Opp. at 23.

The record supports Respondent's argument that Ms. Hathcock should not be awarded lost wages from 2020 and thereafter, as Ms. Hathcock's injury likely resolved by August 2019. In fact, the contemporaneous medical records refute Petitioner's assertion that Ms. Hathcock was unable to work from May 19 to October 19, 2020 (therefore receiving short and long-term disability benefits) *as a result of her left shoulder pain and related symptoms*. Indeed, Ms. Hathcock's medical records from 2020 and beyond instead contain consistent entries that she was unable to perform her job duties as a clinical administrative coordinator (i.e., typing) and was thus out of work due to her *hand* dysfunction and affiliated carpal tunnel syndrome/CRPS – not her left shoulder ailments.

*See,* e.g., Ex. 16 at 25 (a July 6, 2020 note to keep her out of work for another six weeks "given her hand dysfunction"); Ex. 19 at 4 (a November 3, 2020 note that "she [could not] type due to pain in [her left] hand" and she did not feel she could perform her job duties as "there [wa]s no light duty where she work[ed]."); Ex. 13 at 142-43 (a November 23, 2020 note that she was unable to type due to decreased dexterity of the hand and pain in her hand). As such, I will not compensate Petitioner for *any* of Ms. Hathcock's missed employment and subsequent lost wages sought during 2020 or thereafter.

Respondent otherwise agrees that some of Ms. Hathcock's lost wages from 2019 should be awarded – but contends that Petitioner did not apply the proper offsets for Ms. Hathcock's two months of short-term disability when seeking lost wages for this period, making only $1,385.65 appropriate. Opp. at 23. Respondent appears to argue that Ms. Hathcock's short term disability is akin to state unemployment payments or state compensation programs that "are an offset to a lost wages award under the Vaccine Act." *Id.* (citing 42 U.S.C. § 300aa-15(g)).

While Respondent did not offer any specific legal support for this assertion, it is nonetheless consistent with the existing case law finding that disability benefits offset an award for lost wages. *See,* e.g., *Laurette,* 2024 WL 1741611, at *8 (scrutinizing the petitioner's lost wages claim because the petitioner had "not offset his claim . . . with the two disability payments he received" (short and long-term)). Here, the record indeed supports Petitioner's assertion that Ms. Hathcock was out of work for two months (on short term disability) following her June 2019 surgery. *See,* e.g., Ex. 30 at 19-25 (Ms. Hathcock's pay stubs reflecting she was on short term disability from June 9 through August 31, 2019); Ex. 7 at 28 (an August 1, 2019 post-operative orthopedic note that Ms. Hathcock could return to work). I will thus award the sum proposed by Respondent for past lost wages in 2019, and applying the proper offsets for her short-term disability, for a total of **$1,385.65.**

The parties also disagree about the amount to be awarded in unreimbursed medical expenses – with Petitioner requesting $4,420.47 and Respondent proposing $912.10. As already noted, the record establishes Ms. Hathcock's vaccine-related injury had likely resolved by August 2019 (albeit with lingering effects). I will therefore award Respondent's proposed sum, which encompasses unreimbursed medical expenses for Ms. Hathcock's care from October 2018 to August 2019, as this amount is supported by the record – **$912.10.** *See generally,* Ex. 24.

**Conclusion**

For all the reasons discussed above and based on consideration of the entire record, **Petitioner (on behalf of Ms. Hathcock's estate) is entitled to damages in the form of a lump sum payment of $142,297.75 (representing $140,000.00 for past pain and suffering, $1,385.65 for past lost wages, and $912.10 for past unreimbursable expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement.**

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.